CARBO-FROST, Inc., v. PURE CARBONIC, Inc., et al.

PURE CARBONIC, Inc., et al. v. CARBO-FROST, Inc.

Nos. 11134, 11135.

Circuit Court of Appeals, Eighth Circuit.
Feb. 27, 1939.

Rehearing Denied March 29, 1939.

---

Paul R. Stinson, of Kansas City, Mo. (I. P. Ryland, Arthur Mag, Roy B. Thomson, and Lawrence R. Brown, all of Kansas City, Mo., on the brief), for Carbo-Frost, Inc.

Samuel W. Sawyer and John H. Lathrop, both of Kansas City, Mo. (Ernest H. Merchant, of New York City, and Winston H. Woodson and R. Arch Smith, both of Kansas City, Mo., on the brief), for Pure Carbonic, Inc., and others.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

STONE, Circuit Judge.

Carbo-Frost, Inc., is the exclusive licensee of patent to H. B. Rudd #1,785,326 covering "method of and apparatus for utilizing phase-changeable material" and of various applications for patents related thereto—the apparatus covered thereby is called a "liquefier". This patent and these applications had been acquired by Rudd Patents Corporation. March 3, 1932, Carbo-Frost, Rudd Patents Corporation and Rudd executed an exclusive license to Pure Carbonic Company of America, on a royalty basis, "to manufacture and use the methods embodying said inventions", throughout a described territory, "in the commercial practice in and throughout said territory of

212

the art of conversion of solid carbon dioxide ($CO_2$) into gas, and/or liquid, and for no other purpose and in no other territory, subject, however, to all the terms and conditions of this Agreement." April 29, 1933, Carbo-Frost, Rudd Patents Corporation, Pure and Carbonic Dispensing, Inc., executed a contract whereby the above license contract was assigned to Carbonic Dispensing without releasing Pure for performance thereunder by Dispensing.

In 1936, Carbo-Frost filed this action for an accounting under the license contract against Pure Carbonic, Incorporated (not Pure Carbonic Company of America) and Dispensing.[1] The action was removed from the State court. A second amended and supplemental bill was filed seeking to bring into the accounting certain liquefiers (called "Harrisburg liquefiers") acquired by the defendants in 1934 from the American Dry Ice Corporation—defendants having claimed (after this action was filed) that such liquefiers were without the license and having refused thereafter to pay royalty in connection with such liquefiers. Pure answered alleging full payment of all royalties due, denying that the Harrisburg liquefiers were within the license or the patents, challenging validity of the patents covered by the license, pleading estoppel, and other matters. Dispensing answered substantially as Pure but with addition of a counterclaim for $4,152.22 covering royalties alleged to have been paid by mistake in connection with the Harrisburg liquefiers, from April 5, 1934, to March 1, 1936. Plaintiff answered the counterclaim denying except as to payment of royalties in the amount and for the period alleged in the counterclaim. Subsequent interlined amendments to the supplemental bill and the reply tendered the issues that, under the license agreement, the licensee was obligated to use the licensed device and, therefore, royalties should be paid on the Harrisburg liquefiers; and that defendants were estopped to deny royalty liability on the Harrisburg liquefiers. Defendants, separately, joined issue on these interlined matters and pleaded account stated, accord and satisfaction and failure of plaintiff to protect the exclusive use granted under the license. The portions of the answers attacking validity of the patents covered by the license were stricken, on motion. After extended hearing, the court entered a decree to the effect that there were no royalties unpaid except for the use of the Harrisburg liquefiers; that a certain amount was due for use of such liquefiers and denied recovery on the counterclaim. From the part of the decree determining no royalties due (other than for use of the Harrisburg liquefiers) plaintiff appeals. From the part of the decree determining royalties due for use of the Harrisburg liquefiers and for denial of recovery on the counterclaim defendants bring a cross-appeal.

### Plaintiff's Appeal.

The outstanding issue on the main appeal is the construction of the license agreement—particularly, that portion defining payment of royalties. The royalty provision is as follows: "Sixth: Pure[2] shall pay to Carbo-Frost royalties equal to three (3%) per cent. of the net price payable by the user of the apparatus manufactured in accordance with said Inventions (now called 'Liquefiers') for the solid carbon dioxide deposited or used therein for the purpose of converting such solid carbon dioxide into liquid and/or gas, and in addition thereto, a sum equal to three (3%) per cent. of any and all sums paid by the user of said apparatus for the use thereof, whether by way of rental or other charge, howsoever designated, and whether or not any of said sums shall be payable by the user of said apparatus to Pure or to its licensees or sublicensees or others for the solid carbon dioxide supplied and/or for the use of the said apparatus, *provided, however,* that Pure shall not be obligated or required to pay any royalties or sums with respect to solid carbon dioxide sold to any user of said machines, for use in said machines, by any person, firm or corporation not authorized by Pure, or by Pure's licensees or sublicensees, to sell solid carbon dioxide for use in said machines, unless and until Pure, or its licensees or sublicensees, shall have knowledge of such unauthorized sales, and Pure, or its licensees or sublicensees, as the case may be, shall not, within a reasonable time after such unauthorized sales shall have become known to Pure, or its licensees or sublicensees, as the case may be, have caused the discontinuance of the same."

[1] Hereinafter, Pure Carbonic, Inc., will be referred to as Pure and Carbonic Dispensing, Inc., will be referred to as Dispensing.

[2] In the license contract, in the supplemental contract of April 29, 1933, and in the license assignment to Dispensing, the word Pure refers to Pure Carbonic Company of America and not to Pure Carbonic, Inc. (a defendant here).

The dispute as to the meaning of this provision arises from the situation following.

Carbon dioxide ($CO_2$) in a gaseous or liquid state is used extensively in various industries. The apparatus and method covered by the licensed patents is designed to convert solid carbon dioxide (known as "dry ice") into a liquid or gaseous state— apparently, the gaseous state is here involved. The license covers the "manufacture and use" of the patented apparatus and method. Defendants employed two business methods in acting under the license. One of these was to install an apparatus at the place of business of a customer and to service such apparatus by placing therein (when needed) dry ice and by adjusting the apparatus so that the gaseous form would result therein from the dry ice so installed. This method is called "customer operation". The other method was for defendants to use the apparatus at their own plants to produce the gaseous form from the dry ice; to pipe such gas from the apparatus into steel containers (called cylinders); and to sell such gas by delivering it to their customers in the cylinders. This method is called "plant operation". Defendants manufacture no dry ice but buy such for use in both "customer" and "plant" operations.

The above quoted royalty provision requires a royalty of three per cent "of the net price payable by the user of the apparatus * * * for the solid carbon dioxide deposited or used therein * * * and, in addition thereto, a sum equal to three (3%) per cent. of any and all sums paid by the user of said apparatus for the use thereof." In their "customer operation", defendants never made a separate charge for the use of the apparatus or for adjusting the apparatus. The one charge to the customer was so much a pound for the dry ice placed by them in the apparatus used by the customer. Considering the margin of profit to defendants on such dry ice it is probable that charge for use of the apparatus and for servicing was included therein although not separately stated or understood. Whether this be true or whether the use of the apparatus and the servicing was, for business reasons, regarded as without cost the result was that the payment was based entirely on dry ice poundage furnished. On all "customer operation", defendants paid to plaintiff, as royalty, 3% of the amount paid to them by the customers. Royalties for such transactions are recognized by all these parties as being in compliance with the license agreement.

■ The dispute involved in the main appeal concerns the royalties arising out of "plant operation". In such operation, defendants paid a royalty of 3% on the cost to them of the dry ice which they used therein and nothing further.

The dispute arises through the claim of plaintiff that defendants should pay 3% on the amount they receive for the gas (delivered in cylinders). The contention of plaintiff is that, under either customer or plant operation, what the customer wants, buys and pays for is gas; that, in either operation, the liquefier plays the same part, accomplishes the same result and produces the same product; that the royalty provision establishes but one royalty formula which is constant, invariable, and equally applicable to either form of operation; that any other construction of the provision leads to shocking results[3], which could not

---

[3] Plaintiff illustrates this result by stating that in customer operations, the royalty would be 3% of 7 cents per pound of *dry ice* paid by the customer to defendants, while in plant operation the royalty (as calculated by defendants) would be $\frac{1}{254}$ of seven cents per pound of gas so paid by the customer.

Further argument in the brief is as follows: "The right conclusion on this assumption is that the parties intended no royalty at all from plant liquefiers. For this much is certain: The 3% royalty is not to be measured by any sum or sums *paid out* by Pure. And to be consistent, the court should have said that since Pure buys the ice instead of selling it, and itself uses the liquefiers, no plant royalty at all was intended. If paragraph Sixth said or meant that plant royalties were to be figured on the basis of what 'Pure pays a vendor for ice, it could escape royalties entirely by *manufacturing* the ice instead of buying it. It does manufacture some through affiliates (407) and it could and may produce all of it. It could no more sell to itself ice of its own manufacture than it could charge itself for the use of its own liquefiers. And the excuse not to pay would be fully justified by the court's ruling. By the same interpretation, Pure could eliminate all royalties in the customer operation by billing the customer (as Carbo did [212-213]) for gas, as it does in plant operation, instead of for the ice or the use of the liquefier. In fine, armed with the sanction of this ruling, Pure may manip-

have been in the minds of the contracting parties; that the parties have themselves, in the royalty settlements for customer operations, construed the royalty provision to cover the price paid by the customer; that, if the royalty provision cannot be construed, in plant operations, to be the same as the customer price then the license agreement does not cover plant operation and, therefore, plaintiff is entitled to a "reasonable royalty" (which is claimed to be 3% of the gas sales price).

The position of appellees is: that the royalty provision is clear and unambiguous; that it provides two formulae—one for customer operation and one for plant operation; that the formula for customer operation is based on 3% of dry ice price to the customer and an additional 3% for any compensation received for use of the liquefier by the customer; that the formula for plant operation is 3% on the price paid by the "user" (defendants) for dry ice and no more; that, if the royalty provision is ambiguous, the parties have construed the agreement as just stated because plaintiff has not only known fully the basis upon which defendants had paid plant operation royalties but requested the application of such basis and accepted royalties so calculated over a long period and is now estopped to contend otherwise.

The views of the trial court as to these contentions is expressed in an opinion as follows:

"It will have been noted that paragraph 6 provides that the royalty shall be not only 3% of the price of dry ice deposited in liquefiers but 'in addition thereto, a sum equal to three (3%) per cent of any and all sums paid by the user of said apparatus for the use thereof, whether by way of rental or other charge, howsoever designated. * * *.'

"The fact is that defendant charges nothing in connection with the customer operation as rental eo nomine for the use of liquefiers. Undoubtedly, however, it does include in the price at which it sells dry ice to its customer a consideration for the use and servicing of liquefiers. (It does not necessarily follow that defendant's price to its customer for dry ice is higher than would be another's price. The consideration it gets for the use of lique-

fiers well may be the obtaining a customer it otherwise might not have.)

"Plaintiff's theory is that since in connection with the customer operation defendant pays in royalty both 3% on the price of ice used in the liquefiers and also 3% of what really is a rental charge it should pay an *equivalent amount* as royalty in connection with the plant operation. The conclusion seems to us unsound. It is reached by this reasoning. 1. The parties intended the same formula should be used in calculating royalties in both operations. 2. In connection with the customer operation they intended the royalty should be calculated on the value of the finished product, carbonic gas, and so in practice they have calculated royalties in connection with that operation. 3. If, in connection with the plant operation, the royalty is calculated, not on the basis of the value of the finished product but on the basis of the price paid for the raw material, then not the same, but a different formula is used and so the intention of the parties is disregarded.

"We agree that the parties intended the same formula should be used for calculating royalties in connection with both operations. We do not agree that the parties intended that in connection with the customer operation the royalty should be calculated on the basis of the finished product or, to use the phrase of plaintiff's learned counsel, on the basis of 'what the customer got.' In connection with that operation the parties intended *and said* that the royalty should be calculated on the basis of the price of dry ice used plus rental paid. The sum of those two amounts might be the same or less or more than the value of the finished product,—'what the customer got.' The parties certainly did not intend that royalties should be calculated, in part on the basis of 'sums paid by the user of * * * (the) apparatus for the use thereof' in connection with the plant operation *where nothing would be paid 'for the use' of the apparatus* 'whether by way of rental or other charge.' We do not have two formulas. What we have is the application of the same formula (the same multiplier) to different amounts (multiplicands). In the customer operation the multiplicand perhaps is made up of price of ice plus rental charge. *There a rental*

ulate the royalty up or down, or even out, at will, on these or any future operations, by the simple expedient of adopting a method for billing its customers to suit its purpose."

*charge was contemplated.* In the plant operation the multiplicand is made up of price of ice alone. *There no rental charge was nor could have been contemplated.*

"It should be pointed out that we do not have here a use by the defendant of the rights granted in the license agreement entirely different from any that were contemplated by the parties. * * * Here it stands conceded and the evidence and the very wording of the contract show that the 'plant operation' fully was understood as a possibility and anticipated.

"On this phase of the case our conclusion is that the defendant correctly has calculated and paid royalties on all liquefiers conceded by defendant to be covered by patents involved in the case."

It seems to us that the reasoning in this quotation is sound and amply supported by the evidence here. The royalty provision clearly contemplates two situations—one where a customer would use and be charged for use of a liquefier and one where he would not use the liquefier. There are two separate royalties stated. One is 3% based on "the net price payable by the user of the apparatus * * * for the solid carbon dioxide deposited or used" in the licensed liquefier. The other is an "additional" royalty. This additional royalty is 3% "of any and all sums paid by the user of said apparatus for the use thereof * * * whether by way of rental or other charge, howsoever designated * * *." Obviously, the "additional" royalty applies only where something is paid by the user to the licensees or others for use of the liquefier. This construction is emphasized by the further provision—which probably covers both royalties—which is as follows: "and whether or not any of said sums shall be payable by the user of said apparatus to Pure or to its licensees or sublicensees or others for the solid carbon dioxide supplied and/or for the use of the said apparatus, *provided, however,* that Pure shall not be obligated or required to pay any royalties or sums with respect to solid carbon dioxide sold to any user of said machines, for use in said machines, by any person, firm or corporation not authorized by Pure, or by Pure's licensees or sublicensees, to sell solid carbon dioxide for use in said machines, unless and until Pure, or its licensees or sublicensees, shall have knowledge of such unauthorized sales, and Pure, or its licensees or sublicensees, as the case may be, shall not,

within a reasonable time after such unauthorized sales shall have become known to Pure, or its licensees or sublicensees, as the case may be, have caused the discontinuance of the same."

The royalty provision is unambiguous. It means that a royalty of 3% is due based upon the net price of solid carbon dioxide to the user of the machine, whether such "user" of the apparatus be the licensee or its customer, and an "additional" royalty of 3% of any sum "paid" for the use of the apparatus to the licensee or to others. This being true, the portion of the decree denying plaintiff recovery on the item of accounting concerned with recovery from appellees of additional royalty over that already paid in the use of the patented apparatus in plant operations was correct.

### Cross-Appeal.

The cross-appeal challenges those portions of the decree which allowed recovery of royalties where the so-called Harrisburg liquefiers were used and, also, challenges any recovery against Pure Carbonic, Inc., even if recovery on account of the Harrisburg liquefiers be held proper.

### (I) The Harrisburg Liquefiers.

The situation as to these liquefiers is as follows. On April 5, 1934 (about one year after the supplemental contract of license and the assignment of the license to Dispensing—both on April 29, 1933), Pure acquired the assets of American Dry Ice Corporation. Included therein were about one thousand liquefiers of which approximately five hundred were Carbo-Frost and the balance were liquefiers made by the Harrisburg Steel Corporation under a patent to Bowers #2,016,223, and were called Harrisburg liquefiers. For the most part these Harrisburg liquefiers were then in use by customers of American Dry Ice Corporation. Since the purchase by Pure, the Harrisburg liquefiers have been used only by customers (customer operation). After the purchase and until March 31, 1936, royalties were paid upon customer operation of Harrisburg liquefiers the same as upon Carbo-Frost liquefiers so used. This action had been filed March 16, 1936. The change in position came July 7, 1936, when Pure wrote Carbo-Frost that quarterly payment of royalties on use of Harrisburg liquefiers would be "discontinued as of March 31, 1936." The reason stated in the letter was that the Harrisburg apparatus "appears to be foreign to the

patents which you hold." The letter stated:

. "If it is your opinion that the Harrisburg equipment does infringe your patents we would be pleased to participate with you in a suit against a user of such equipment according to the terms of our contract with you. Should you decide that it is advisable to take such action, we suggest that the suit be filed in Brooklyn where reasonably prompt trial can apparently be obtained and where Harrisburg equipment is in present day use.

"Will you kindly advise us promptly concerning your decision in this regard."

Receiving no answer, Pure again wrote (on July 21, 1936) as follows:

"We wrote you on July 7, 1936, concerning liquefiers manufactured by the Harrisburg Steel Corporation, requesting that you let us have an immediate reply to our suggestion that suit be brought against the user of this equipment with your help and consent.

"As you know, we have been corresponding and discussing with you over a long period of time the question of bringing suit in connection with these patents, but due to lack of cooperation on the part of your organization it will be impossible to take any action.

"Will you please let us have a prompt reply to our letter of the above date."

On August 10, 1936, Carbo-Frost answered as follows:

"Your letters of July 7 and July 21, 1936, were not answered earlier because of the fact that I, the writer, Treasurer of Carbo-Frost, Inc., have been in Alaska for a month and our Company's only office is my office at the above address.

"In your July 7 letter you advise that you are discontinuing as of March 31, 1936, payments to us of all royalties under the existing license agreements where either you or others use liquefiers manufactured by Harrisburg Steel Corporation. This action, you say, is based on the opinion of your attorneys that the Harrisburg devices do not infringe any of the Rudd patents. At the same time you invite us to join you in an infringement suit against some user of such equipment.

"While up to now we have never had the benefit of an examination of your books and records, it is our understanding that when your Company took over Dryice Corporation of America, (or its successor) you acquired a number of the Harrisburg devices and that you have for several years been paying to us your conception of a royalty on these very devices which your attorneys and your Company now say do not infringe. If we are correct in this assumption, then we should be glad to know from you the reason for your sudden change of view.

"Please be advised also that if you carry out your threat and discontinue the payment of royalties as outlined in your communications you will be held to full accountability for such action.

"The Harrisburg devices embrace and embody the same principles as the inventions covered by the license agreements. Moreover, your Companies have expressly so admitted. Our attorneys advise us that your Company cannot escape the payment of royalties by the expedient of the claims embraced in your letters about the Harrisburg devices and that the matter can be brought to the attention of, and tried out in, the Court before which the present suit is pending.

"It would hardly seem justifiable, therefore, from our point of view that we should join you in an infringement suit against others on account of your use of the Harrisburg devices, if you and your Companies in the pending suit are going to take the position that you are not obliged to pay royalties on such devices because they do not infringe. For you would have to be affirming in the proposed suits that which, of necessity, you must deny in the pending litigation.

"If we are successful and you are unsuccessful in our respective contentions in the pending suit concerning the Harrisburg devices, then we can discuss together the advisability of suing others as infringers.

"We feel also that your Company ever since it began its so-called plant operations in volume under the license agreement has wholly failed to live up to your contracts with regard to the payment of royalties and that we should await the outcome of our present suit against you to have established our right to the royalties rightfully due us before undertaking suits against others. Already we have obligated ourselves to pay out as attorneys' fees in the infringement suits already brought (in which infringement was established and conceded) sums of money which have made the net royalties collected by us to date not much

greater than the expenses of such litigation. The undertaking of additional litigation expense under the meagre royalties we are now receiving would in all probability reduce our net royalties to a point where the net would be little or nothing for some time to come.

"After the litigation between us has been settled, we shall be glad to take up with you any suggestions that you may then have about the bringing of infringement suits, but we are not disposed to join with you in any such action at this time."

November 13, 1936, plaintiff filed its Second Amended and Supplemental Bill. The Supplemental Bill brought the Harrisburg liquefier royalty obligation after March 31, 1936, into the accounting. The Second Amended and Supplemental Bill with the separate answers of the defendants and the answer to the counter-claim pleaded by Dispensing raised the following issues as to the Harrisburg liquefiers: (a) the right of plaintiff to recover royalties where Harrisburgs were used; and (b) the right of Dispensing to recover royalties paid where Harrisburgs were used. The court determined these issues in favor of plaintiff. These two issues as to the Harrisburg liquefiers may be examined together.

While the broad issues as to the liability for royalties for use of the Harrisburgs are as above stated, yet the decision of those broad issues depends upon the determination of other issues which constitute reasons why that liability should or should not be. Those issues are as follows.

(1) Is liability imposed by a so-called "exploitation" clause in the license agreement?

(2) Does the course of conduct of defendants in paying royalties on the use of Harrisburgs and in publishing (on the Harrisburg liquefiers used by customers) that they are covered by the licensed patents estop denial of liability for royalties?

(3) Is the similarity of the Harrisburgs to the patented liquefiers such as to require payment of royalties?

(1) *Exploitation Clause.* The license agreement of March 3, 1932, granted an exclusive license to "manufacture and use" the methods embodied in the patent and the patent applications named, during the lives thereof, and covering the United States, Canada, Mexico and Cuba. The license covered, also, all improvements "made or acquired" either by Rudd Patents Corporation or by Carbo-Frost. Both Rudd Patents Corporation and Carbo-Frost were bound not to "manufacture, use or sell" within this territory. The compensation for these license rights was solely the royalties provided in the agreement.

Paragraphs Tenth, Thirteenth, Fourteenth and Fifteenth were as follows:

"Tenth: Pure hereby covenants and agrees to bear the expense, not exceeding Twenty-five Thousand Dollars ($25,000) of conducting an action for infringement of said letters patent No. 1,785,326 and/or the letters patent to be granted on application Serial No. 341,712 to be filed by Rudd and Carbo-Frost against an infringer of said letters patent within said territory, such expense to be paid by Pure when, as and if bills for services and/or disbursements are rendered by the attorneys conducting such action. The attorneys to be retained by Rudd and Carbo-Frost for the purpose of conducting such action for infringement are hereby named as follows:

Pennie, Davis, Marvin & Edmonds, of 165 Broadway, New York City, New York.

"All sums paid by Pure under the terms of this paragraph Tenth shall be credited to Pure on the books of Carbo-Frost as advances against royalties to be paid by Pure to Carbo-Frost, as provided in paragraph Sixth, and Pure shall be entitled to deduct quarter annually from royalties hereafter to become due, a sum equivalent to two and one-fourth per cent (2¼%) of the amount standing to the credit of Pure on the books of Carbo-Frost at the time of payment of such royalties.

\*   \*   \*   \*   \*   \*   \*

"Thirteenth: Pure shall not be obligated to promote the exploitation of said inventions until the validity of said letters patent No. 1,785,326 and/or the letters patent to be granted on application Serial No. 341,712, and the right of Rudd and Carbo-Frost to exclusively manufacture, use and sell the inventions therein described shall have been confirmed by a court of competent original jurisdiction.

"Fourteenth: If and when the validity of said letters patent No. 1,785,326 and/or the letters patent to be granted on application Serial No. 341,712 and the right of Carbo-Frost and Rudd to the exclusive use of said Inventions shall have been confirmed by a court of competent original jurisdiction, Pure shall thereupon and there-

after during the term of this Agreement continuously use its best efforts to promote the exploitation and use of the apparatus and methods of said Inventions within said territory, either directly or through licensees or sublicensees, and if the said events shall have occurred and Carbo-Frost shall be of the opinion that Pure is not using its best efforts to promote such exploitation and use of said apparatus and methods, such question may, at the option of Carbo-Frost, be submitted to three arbitrators in the City of New York, to be appointed in the following manner; viz.: Carbo-Frost shall serve upon Pure a notice in writing stating that it desires to submit to arbitration the question of Pure's best efforts in promoting the exploitation of said machines, and naming the arbitrator appointed to represent it, Pure shall, within ten days after the receipt of said notice, appoint an arbitrator to represent it, and shall serve on Carbo-Frost a notice naming the said arbitrator. The two arbitrators so appointed shall, within ten days after the appointment of the second arbitrator, appoint a third arbitrator to act with them, and the decision of any two of the said three arbitrators shall be binding and conclusive upon the parties. In the event that Pure shall fail to serve on Carbo-Frost a notice naming the arbitrator appointed to represent Pure as hereinabove provided, or in the event that the arbitrators appointed by Pure and Carbo-Frost shall fail to appoint a third arbitrator to act with them as hereinabove provided, such arbitrator to represent Pure or said third arbitrator, as the case may be, shall be appointed by the then President of the American Arbitration Association, or upon the application of either Pure or Carbo-Frost, by a justice of the Supreme Court of the State of New York, without further notice to either party.

"Fifteenth: In the event that the arbitrators appointed in the manner provided for in paragraph Fourteenth of this Agreement shall decide that Pure is not using its best efforts to promote the exploitation of the said machines, Carbo-Frost may, at its option, terminate this Agreement by giving Pure ninety days' notice in writing of its intention so to do, which cancellation and/or termination shall be without prejudice to any other rights or remedies then or thereupon accruing to Carbo-Frost."

It was provided, also, that the rights and remedies set forth in the contract were "in addition to and not in lieu, or in limitation, or in derogation of the rights and remedies otherwise granted, and by law or equity granted and vested in the respective parties."

By a subsequent contract[4] paragraph Tenth was modified; paragraph Thirteenth was waived; and paragraph Fourteenth

---

[4] The substantial parts of this contract are as follows:

"Whereas, by an Agreement in writing, dated March 3, 1932, Carbo-Frost and Rudd did grant to Pure the exclusive right and license to manufacture and use the apparatus and methods of certain letters patent and applications for letters patent therein described; and

"Whereas, paragraph Tenth of said Agreement, dated March 3, 1932, provides that Pure shall bear the expense, not exceeding $25,000, of conducting an action for infringement of one of the letters patent in said Agreement described, to-wit, letters patent of the United States No. 1,-785,326, against an infringer thereof; and

"Whereas, paragraph Thirteenth of said Agreement, dated March 3, 1932, provides that Pure shall not be obligated to promote the exploitation of the Inventions described in said Agreement until the validity of said letters patent No. 1,785,326 and/or the letters patent to be granted on application serial No. 341,712, and the right of Rudd and Carbo-Frost to exclusively manufacture, use and sell the Inventions therein described, shall have been confirmed by a court of competent original jurisdiction; and

"Whereas, paragraph Fourteenth of said Agreement, dated March 3, 1932, provides that if and when the validity of said letters patent No. 1,785,326, and the right of Carbo-Frost and Rudd to the exclusive use of the Inventions described in said Agreement shall have been confirmed by a court of competent original jurisdiction. Pure shall thereupon and thereafter continuously use its best efforts to promote the exploitation and use of the said Inventions in the territory described in said Agreement; and

"Whereas, suits have been instituted by Carbo-Frost and Rudd, against William Wharton, Jr., & Co., Inc., and Dry-Ice Corporation of America, alleged infringers, and it is proposed that said suits be dismissed without prejudice and without costs to any party, and said William Wharton, Jr., & Co., Inc., proposes to take a license from Pure to manufacture the apparatus referred to; and

"Whereas, Pure is willing to waive the provisions of paragraph Thirteenth of said

was modified to require Pure to "continuously use its best efforts to promote the use of the apparatus of said inventions within said territory, either directly or through licensees or sublicensees."

In this state of the contract and of the related facts, plaintiff contends that, irrespective of whether the Harrisburgs infringe the license patents, the use by the licensee of such devices requires payment of royalty thereon to prevent a fraud upon the rights of plaintiff under the above provision obligating the licensee to "continuously use its best efforts to promote the use of the apparatus" covered by the license.

Defendants oppose this contention by denying that the effect of this contract provision is as asserted by plaintiff: by claiming a waiver of such provision by plaintiff through its refusal or failure to test the infringement of its patents by the Harrisburgs—either in this action or in an action against other users of Harrisburgs—even though invited by defendants to make such test. Defendants' contention of waiver is no pertinent answer to plaintiff's contention because the issue tendered by plaintiff is irrespective of infringement—such issue being one of construction of the license contract rather than one of infringement (Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 586–587, 588, 589, 26 S.Ct. 150, 50 L. Ed. 317). To treat the issue as being merely one of infringement would effectively eliminate paragraph Fourteenth from the license contract. The issue is, therefore, whether defendants' use of Harrisburgs violated the contract obligation to "continuously use its [licensee's] best efforts to promote the use of the apparatus of said inventions * * *, either directly or through licensees or sublicensees."

The construction of the above contract requirement is made certain for us by Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317. That case

---

Agreement, dated March 3, 1932; and

"Whereas, in view of the foregoing, the parties deem it desirable to modify said Agreement, dated March 3, 1932;

"Now, Therefore, in consideration of the premises and of the mutual and dependent promises hereinafter stated, the parties agree:

"1. Paragraph Tenth of said Agreement, dated March 3, 1932, is hereby amended so that from and after the date of this Agreement, said Paragraph Tenth shall read as follows:

" 'Tenth: Pure shall bear the expense, not exceeding $25,000 (including all sums paid by Pure, or for the payment of which Pure became obligated, from March 3, 1932, to and including April 29, 1933), of conducting such suit or suits for infringement of United States letters patent Nos. 1,785,326 and/or 1,855,313, as Carbo-Frost, Rudd and Pure may mutually agree to institute, *provided, however*, that Pure shall not unreasonably refuse to agree to the institution of any suit proposed by Carbo-Frost and Rudd. The expense of such suit or suits shall be paid by Pure when, as and if bills for services and/or disbursements are rendered by the attorneys conducting such action. The attorneys to be retained by Rudd and Carbo-Frost for the purpose of conducting such suit or suits for infringement are hereby named as follows:

" 'Pennie, Davis, Marvin & Edmonds, of 165 Broadway, New York City, New York.

" 'All sums paid by Pure under the terms of this paragraph Tenth shall be credited to Pure on the books of Carbo-Frost as advances against royalties to be paid by Pure to Carbo-Frost, as provided in paragraph Sixth, and Pure shall be entitled to deduct quarter annually from royalties hereafter to become due, a sum equivalent to two and one-fourth per cent. (2¼%) of the amount standing to the credit of Pure on the books of Carbo-Frost at the time of payment of such royalties.'

"2. Pure does hereby waive the provisions of paragraph Thirteenth of said Agreement, dated March 3, 1932.

"3. The first sentence of paragraph Fourteenth of said Agreement, dated March 3, 1932, is hereby amended, so that from and after the date of this Agreement, the first sentence of said paragraph Fourteenth shall read as follows:

" 'Fourteenth: Pure shall, during the term of this Agreement, continuously use its best efforts to promote the use of the apparatus of said Inventions within said territory, either directly or through licensees or sublicensees, and if Carbo-Frost shall be of the opinion that Pure is not using its best efforts to promote the use of said apparatus, such question may, at the option of Carbo-Frost be submitted to three arbitrators in the City of New York, to be appointed in the following manner, viz.: Carbo-Frost shall serve upon Pure a notice in writing of its desire to arbitrate said question and naming an arbitrator to represent it. Pure shall, within ten days after the receipt of said notice, serve on Carbo-Frost a notice in writing naming the arbitrator to represent it.' "

was an action for accounting by a patentee against the assignee of the patents. The assignment was for royalties. The assignee was obligated to "use due business diligence in the manufacture and sale of the devices embodied in said letters patent, and push the sale by all proper and legitimate enterprise." The accounting sought to bring within the contract two devices of the same general character—one covered by a patent to Morrow and one not patented. The Court of Appeals of the District of Columbia had held (16 App.Cas.D.C. 468) that royalty was due upon both of the two above devices upon the ground (page 474) that:

"It had contracted with the appellee with full knowledge of the nature and character of the latter's invention, and with reasonable ground to anticipate, what is usual in all such cases, that other similar, and perhaps even superior, devices might be invented and come into use. With that knowledge and with that anticipation, it had deliberately undertaken and bound itself by agreement to manufacture and sell the Farrow device, not in terms, it is true, to the exclusion of all other devices, but, according to the requirements of the contract, 'with due diligence' and by 'all proper and legitimate enterprise.' And having so bound itself to the appellee, and having practically shut out the appellee from that field of invention, it was not thereafter at liberty to relieve itself from liability under the contract by discarding the invention of the appellee and substituting therefor the invention of another person. It can not be that the vitality of such a contract can be made to depend on the assumption that no other similar device is coming into the market. The company, and not the appellee, took the risk of new inventions that might be superior to that of the contract. No such contract would be inviolable, if one of the contracting parties should be at liberty to withdraw from it, for the reason that during the lifetime of the contract some new device had appeared."

The Supreme Court held such construction of the contract erroneous and that the royalty did not apply unless, by "broad comparison and contrast" (page 591, 26 S.Ct. page 154) or by "a summary statement of the nature of the different devices" (page 589, 26 S.Ct. page 153), the device embodied the patents licensed and was a better device.[5] Applying this rule to the evidence, the Court made this "broad comparison and contrast" of the Morrow device and of the other device (called E 10) and reached the conclusion that royalties were recoverable for the Morrow device and not recoverable for the E 10 device.

The language of the Court in discussing the Morrow device (for which it allowed recovery of royalties) and in discussing the E 10 device (for which recovery of royalties

---

[5] At page 588, 26 S.Ct. at page 153, the Court states:

"It should be repeated that, so far as the company made any device embodying Farrow's invention, by the fair construction of its express covenant it was bound to account, whether the manufacture was ostensibly Farrow's or not, and he was not left merely to an action for such damages as he could prove.

"On the other hand, the contract was not made on the footing that no coaster or no combination of coaster and brake ever had been invented, and that the whole field belonged to Farrow. Both parties knew something of the state of the art. The very facts which show that they stood on an equal footing, and that the company was not deceived by Farrow, show that. The contract shows the same thing on its face. It recites that Farrow has invented, not a mechanism for coasting and braking, but an improvement pertaining to such mechanism. It was a contract having definite reference to the course of the Patent Office, and was for the contents of the application already filed. The application recognizes the existence of coasters. So that the contract only embraces what the parties reasonably may be understood to have expected to be patented. Furthermore, the provision for the cessation of payments on final adverse action must be applied to such claims as were rejected for want of novelty; and after such rejection Farrow can make the defendant account only for the use of devices embodying what remained of his claims. Obviously, also, the fact that, subject to the foregoing qualifications, the defendant took the risk of the value of Farrow's alleged invention, even when coupled with its covenant to use due business diligence in pushing their sale, did not preclude it from using any later invention, if one were made which superseded Farrow's and did not embody it. Due business diligence would not require it to enter into a hopeless contest, and would not prevent it from avoiding such a contest by purchase. In that event it would not be accountable to Farrow for royalties on the new machine."

was denied) is instructive as to the character of examination—the "broad comparison and contrast"—to be made by us in determining liability here for the Harrisburgs and also as to the importance of the device being better than the one licensed.

Examining the Morrow device, the Court said:

"In Farrow's application and Morrow's first device there was the same clutch mechanism on the rear wheel to permit coasting, and in both a contrivance for bringing a brake shoe to bear upon the rear wheel by back pedaling. Farrow accomplished this result by means of a hood pivoted to the bicycle frame, embracing the upper run of the chain and having a pivoted tooth or pawl. With the hood is connected a rod having the brake shoe on its end. Back pedaling, causing the chain to slacken, lets it drop down upon the pawl and engage it, and thereby pulls back the hood and rod and brings the brake shoe to bear. By a second device, which the defendant is not in a position to say was not patentable, the brake was applied by the front instead of the rear sprocket wheel, which, in case of back pedaling, engaged a lever and put on the brake. Morrow used the front sprocket wheel and made it apply a lever with a brake shoe by means of a clutch. The details of the means of application differ, but it cannot be doubted that, assuming the novelty in Farrow's invention which the contract assumes. Morrow, in the language of the contract, was embodying that invention. It covered the very thing which Farrow's invention was expected and mainly relied on to supply. Taking into account the fact that the defendant did not make due efforts to carry out his application, and that it certainly does not appear that the Morrow device was so much, if at all, better than Farrow's, that due business diligence did not require the company still to push the latter, we are of opinion that on this item it properly was held to account."

Examining the E 10 device, the Court said:

"Farrow also embraced a hub brake in his applications. One of his devices was to have the rear sprocket wheel connect with the hub of the rear wheel by a screw clutch. When the sprocket wheel was moving forward it was screwed into fixed connections with the hub. When the pedals were held fast, so as to hold the sprocket wheel also fast through the medium of the chain, the bicycle, continuing its motion, unscrewed the sprocket wheel fom the hub, disconnected it, and coasted. Back pedaling brought a projection on a spring in and attached at one end to the rear sprocket and encircling the hub, into contact with a fixed point on the frame, and thus caused the spring to embrace the hub so long as pressure was applied. On the pressure being released, the spring expanded and allowed the hub to revolve loosely within it. In the coasting or braking, it will be seen, the sprocket wheel was moved along its axis a short distance outward from the rear wheel, thus giving a slant to the chain. When a forward movement was resumed, the tendency of the chain under the pressure upon it to get back into a straight line was enough to carry the sprocket wheel inward again upon its axis so as to lock it once more to the rear wheel by the screw clutch. There are further details but this simple outline is enough for our purposes, which are only those of broad comparison and contrast.

"In Exhibit E 10 the characteristic lateral motion of the sprocket wheel on the extension of the hub does not appear, and neither Farrow's rotating brake spring nor his lever is used. The engagements are effected by the movement of a clutch ring with cam inclines, the sprocket wheel having co-operating cam inclines. When the sprocket wheel moves forward the latter cam inclines ride upon the former, force the clutch ring inward, and allow it to grasp the hub by friction, and revolve with it. On back pedaling the square shoulders of the cam inclines engage, the clutch ring is moved backward with the sprocket wheel, and cam inclines on the inner side of the ring force a brake ring inward into a hollow conical brake shoe connected with the frame of the machine, and having no rotary movement. The brake shoe thus is forced inwardly into a brake cup and effects braking by its friction. In this case, as in the former, a general indication of the nature of the device is sufficient on the question whether the latter embodies the former in the sense of the contract. This question is answered by the description which we have given. It is true that in both the sprocket wheel is arranged to engage or disengage with the main wheels of the machine, to allow coasting and to brake by a reverse action of the rider's feet. But the methods by which these results are accomplished are so different that it is only on the assumption that Farrow was, in the

broadest sense, a pioneer, and had covered the whole ground, or at least that the contract put him in that position relatively to the defendant, that the claim in respect of E 10 could be allowed. It is not pretended that Farrow occupied such a position as an inventor, and our construction of the contract does not give it the supposed extent. The auditor found that there was a radical difference between the contrivances in construction and operation, and there has not been and could not be a finding to the contrary. The ground on which the account was ordered was that the contract required it, notwithstanding all the difference which the auditor found. We could not come to that conclusion unless we at least were satisfied that it was inconsistent with due business diligence in pushing Farrow for the defendant to take up with E 10. The witnesses pointed out important superiorities in the latter, which we need not repeat, in the way of avoiding clogging by mud or ice, in applicability to a chainless machine, in more immediate and certain operation, and in requiring a less continuous exercise of force. On these points they were not contradicted. If, as we think, E 10 did not embody Farrow's invention, and if the company reasonably and honestly thought it a better thing, it had a right to do what it did. We cannot say that it was not warranted in its preference of E 10, or that it was not honest in its choice. It follows that, with regard to this, the decree must be reversed."

From the above it is clear that the rule announced in the Farrow case is that to escape liability for royalties under a contract requiring promotion of an assigned or licensed device the outside device must be both better than and different from the assigned or licensed device. The requirement that such device be better is as important as the requirement that it be different. This is clear from the expressions of the Supreme Court (in the Farrow case) in determining that the E 10 device was not subject to royalty. On pages 591, 592, 26 S.Ct. on page 154 of that opinion, the Court recites that the auditor in that suit had found "a radical difference between the contrivances"; that such finding was proper; and that accounting for that device was decreed below on the ground "that the contract required it, notwithstanding all the difference which the auditor found." The opinion (page 592, 26 S.Ct. page 154) disposes of the recited situation as follows:

"We could not come to that conclusion *unless we at least were satisfied that it was inconsistent with due business diligence in pushing Farrow for the defendant to take up with E 10. The witnesses pointed out important superiorities in the latter,* which we need not repeat, in the way of avoiding clogging by mud or ice, in applicability to a chainless machine, in more immediate and certain operation, and in requiring a less continuous exercise of force. On these points they were not contradicted. If, as we think, E 10 did not embody Farrow's invention, *and if the company reasonably and honestly thought it a better thing,* it had a right to do what it did. We cannot say that it was not warranted in its preference of E 10, or that it was not honest in its choice." (Italics added)

Also, in disposing of the Morrow device and immediately after stating its similarity to Farrow's device, the Court (page 590, 26 S.Ct. page 153) says: "Taking into account the fact that the defendant did not make due efforts to carry out his application, and that it certainly does not appear that the Morrow device was so much, if at all, better than Farrow's, that due business diligence did not require the company still to push the latter, we are of opinion that on this item it properly was held to account."

The reason is clear. Both parties must understand that the licensed device may have to meet competitive devices. If the competitive device be only different from—no better than, in a practical business sense—the licensed device, then the contract provision for promotion or exploitation requires the licensee to enter that competition. If he finds it expedient to purchase the competing device and sees fit to use it in place of the licensed device, he must pay royalty thereon. Otherwise he perpetrates a legal fraud on the licensor because he escapes (in whatever measure he desires) all liability to promote or exploit—thus he not only nullifies, at his pleasure, a provision of the license which is of vital importance to the licensor but he retains control of the licensed device with no burden to himself. On the other hand, if the competitive device is superior to the licensed one, "due business diligence [here, "best efforts to promote"] would not require it to enter into a hopeless contest, and would not prevent it from avoiding such a contest by purchase. In that event it would not be accountable * * * for

royalties on the new machine" (Farrow case, supra, page 589, 26 S.Ct. page 153).

The language in and requirements under the contract in the Farrow case is substantially the same as in and under the contract before us. The rule stated in that case is the rule to be followed by us. That rule is that there is liability for royalties here if, and only if, the Harrisburgs substantially embody the device here licensed —such similarity to be determined by a "broad comparison and contrast" of the two devices—and are no better. The issue is not at all one of infringement. It is whether, broadly and generally considered, the Harrisburgs are equivalent to the licensed device. One difference from an infringement issue is that we are not here concerned with the prior art as limiting the licensed device—the licensed device must be taken as it is stated in the patent (Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 591, 26 S.Ct. 150, 153, 50 L.Ed. 317).[6]

Is then the Harrisburg liquefier a better and a substantially different device? It must be both to escape royalty. It is not contended that Harrisburg is a better device and there is no evidence which would justify a reversal of the finding of the trial court that "the licensed devices * * * perform the same function * * * at least substantially as well as the so-called Harrisburg devices." Therefore, royalties were properly recovered and recoverable for use of the Harrisburg liquefiers, whether they were or were not different from the licensed liquefiers. This determination makes useless examination of the other issues, presented on the cross-appeal, relating to the use of or liability for use of the Harrisburg liquefiers.

II. Liability of Pure Carbonic, Inc.

In the earlier parts of this opinion— dealing with the main appeal and with the Harrisburg liquefiers—we have had no thought as to whether both of the defendants were liable for the royalties found due because that issue involves facts and legal principles entirely foreign to those issues considered hereinbefore.

The cross-appellants contend that Pure Carbonic, Inc., is not liable for royalties because it was not a party to the original license (which was with Pure Carbonic Company of America) or to the assignment of the license (which was to Carbonic Dispensing, Inc.).

Cross-appellee does not claim that Pure was a party either to the original license or to the assignment. It bases the liability of Pure upon either of two propositions: (1) that the corporate relation of Pure to Dispensing and other corporations is such that it would be a fraud upon it not to hold Pure liable; and (2) that it can take advantage of a provision in a contract between Pure and Pure Carbonic Company of America—such contract provision being (it claims) for its benefit.

(1) The Corporate Relation of Pure.

At the threshold of this issue, cross-appellants interpose the objection that there can be no liability of Pure under the so-called corporate "instrumentality" doctrine unless there was a fraud worked upon cross-appellee by the various corporate relationships and that while the relationship is pleaded in the Second Amended Bill there is no allegation therein of resulting fraud to cross-appellee.

This objection is unsound. The facts of the corporate relationship were pleaded and appear undisputed in the evidence. The parties and the trial judge treated this issue of liability of Pure as being present. The Court ruled thereon. In this state of the record we may (Norton v. Larney, 266 U.S. 511, 516, 45 S.Ct. 145, 69 L.Ed. 413), and do, assume the pleadings, as amended, to accord with the facts.

The pertinent facts as to corporate relationship are as follows. Prior to October 1, 1929, Pure Carbonic Company of America was an existing Delaware corporation. About that date, it caused to be organized, in Delaware, Pure Carbonic, Inc. (a defendant here), with capital stock of $5,000.00, wholly owned by the parent company. On that date, the two companies entered into a contract where Pure (therein called "Sales") was employed by Pure of America (therein called "Pure"): "as its agent to manage and operate, during the term of this contract, all plants for the production of carbonic acid gas and any and all other gases in gaseous, liquid and solid form, and all by-products thereof, and for the manufacture of apparatus and containers for the utilization and transportation of such gases, which it or its sub-

---

[6] The Court there said: "* * * assuming the novelty in Farrow's invention which the contract assumes * * *."

sidiary or controlled companies now own or control, or which it or they may hereafter build or acquire; and likewise employs Sales as its agent to market and sell, during the term of this contract, the output of all such plants."

Other pertinent provisions of the contract were as follows:

"Third: Pure agrees (1) to gives Sales the use of all cylinders, containers, motor trucks, equipment and shipping facilities, which it now owns or may hereafter acquire; (2) to supply such working capital as Sales may need; (3) to provide such executive management (but not accounting, bookkeeping and clerical service), and office accommodation and facilities, as may be necessary for the proper conduct of Sales business; and (4) to procure for Sales such contracts with Pure's subsidiary or controlled companies as will enable Sales to exercise in each case the agency hereby created, and as will in each case constitute Sales the agent of such subsidiary or controlled company.

"Fourth: Sales agrees (1) to manage and operate efficiently and carefully all of said plants; (2) to maintain the same in first class condition, charging necessary repairs and replacements to operating expense and setting aside and charging to operating expense proper reserves for depreciation and for wear and tear not immediately replaceable by repairs; (3) to distribute, market and sell, the product manufactured in said plants as efficiently as possible, realizing, to the best of its ability, the largest obtainable gross receipts therefrom; (4) to pay all expenses of such operation, maintenance and selling, and to discharge all expenses or liabilities incurred therein or thereby and to collect all accounts receivable or other proceeds resulting therefrom; (5) to credit monthly on its books to Pure all profits accruing to it from the operation of its entire business over and above an amount equal to six per cent (6%) per annum on its outstanding capital stock, which said amount it is hereby authorized to deduct and retain, and it hereby agrees to accept as full compensation for its services hereunder; and (6) to pay over to Pure under demand any profits becoming due and credited to Pure as aforesaid.

"This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the parties hereto."

On April 17, 1933, Pure of America caused Dispensing to be organized, in New York, with capital stock of $200.00, wholly owned by the parent company. April 29, 1933, the license was assigned to Dispensing—Pure of America expressly assuming liability for performance by Dispensing.

In 1934, Pure of America caused Dry Ice, Incorporated, to be organized and wholly owned its stock.

The general business of the entire corporation structure seems to have been the sale of carbon dioxide in solid, liquid and gaseous forms. The places in this set up of the various companies was as follows.

Pure of America turned over its property to Pure under the agreement of October 1, 1929, and thereafter seems to have been solely concerned in receiving the profits (above $300.00 dividends allowed Pure under the contract) from Pure and in directing the general policies of the business.

Dispensing (organized in 1933) held the license as assignee. Besides this license contract, it had no assets except the capital stock of $200.00. It transacted no business, kept no books, had no employees, paid no dividends. It had no contracts with Pure or any one else. It was simply an incorporated repository of the license agreement.

Dry Ice, Incorporated (organized in 1934), bought dry ice from the manufacturers thereof. It turned over to Pure such dry ice as Pure needed, at the cost price to it (Dry Ice), and sold dry ice to other customers. It had no contract with Pure or other of members of this corporate family. It paid no current dividends.

Pure was the active operating unit. It owned the plants and much of the equipment; apparently manufactured the liquefiers; manufactured liquid and gaseous carbon dioxide; sold dry ice to customers using liquefiers; and sold liquid or gaseous carbon dioxide to others. It kept complete books on its operations and business; calculated and paid royalties and reported to Carbo-Frost. It is true that the vouchers accompanying royalty checks to Carbo-Frost were endorsed "this payment made for the account of Carbonic Dispensing, Inc.", but the checks were by Pure. It received no funds from and paid none to Dispensing. All net funds, above the $300.00 annual dividend allowed under the above contract with Pure of America, were paid over to Pure of America as long as that

corporation existed. It had no contract with any of the other corporations, except the contract with Pure of America (October 1, 1929), but continued the same method of operation and accounting from October 1, 1929, to the date of trial although the license passed by assignment to Dispensing and although there were various corporate changes (to be stated hereinafter).

This action was filed April 1, 1936. In July, 1936, there was a rearrangement of corporations. At that time Air Reduction Company, Incorporated, owned all of the capital stock of Pure of America, which, in turn, owned all of the capital stock of Pure, of Dispensing, and of Dry Ice, Incorporated. In July, 1936, Pure of America was dissolved, all of its assets going to Air Reduction as a liquidating dividend; Dry Ice, Incorporated, was dissolved and a new Dry Ice, Inc., organized—the assets of the old Dry Ice going to Air Reduction and to the new company.

All of the above companies have the same offices. While not identical, there is much similarity in the personnel of the officers and directors of the various companies. The control of all is, obviously, in the same hands and the business policies are in common and toward a unified result. In short, there is really but one group engaged in a single business but, for their own purposes, operating different departments of that business through separate corporations. Apparently, the physical property used in the business is very largely concentrated in Pure—at least appears upon its books. The exception is that there is evidence that Air Reduction (at the time of trial) carried the liquefiers and gas cylinders on its books and that these liquefiers had theretofore been owned by Pure of America.

Our interest in the corporate status of the above business is confined to the effect thereof upon the rights of this plaintiff—rights created by and resting upon the license contract. How does this status affect those rights? If Dispensing (being assignee from the licensee of this license contract) is the only entity liable to plaintiff for the performance of the license contract, there can be no realization of recovery for a violation of that agreement. If Pure is immune because not a party to the license contract or the contract of assignment, then a licensee can, through the facile method of variously incorporating branches or departments of its business, entirely escape .legal liability for legal wrongs. In short, may use the forms of law to perpetrate a positive fraud. Courts of justice do not permit such chicanery to realize its purpose.[7] Pure is the manufacturing, and selling unit in this aggregation. It is the unit and the only unit actually operating and earning under the license contract. It is liable for violation of that contract. Whether it alone is liable is of no moment here. The issue here is whether it is liable. We hold it is.

### Conclusion.

The result of the above discussion of the various issues necessary to determination of this appeal and cross-appeal is that the decree is affirmed.

WOODROUGH, Circuit Judge (dissenting in part).

I think the majority opinion ably demonstrates the correctness of the trial court's decree in denying plaintiff additional royalties over those already paid, and in fastening responsibility for the contract royalties upon Pure Carbonic, Inc., but it appears to me that there is no liability for unpaid royalties on account of the dry ice furnished to the users of the Harrisburg liquefiers. The buying out of the American Dry Ice Corporation extended the market for gas made exclusively in Rudd liquefiers and so increased the royalties to be paid. Supplying dry ice to those customers who were already in established possession of Harrisburg liquefiers evidences no evasion of the licensee's obligation to use its best efforts to promote the use of the apparatus of the Rudd inventions. It seems to me the licensee defendant should have the right to adjudication whether or not Harrisburg infringes. Eclipse Bicycle Co. v. Farrow, 199 U.S. 581, 26 S.Ct. 150, 50 L.Ed. 317, where the licensee, obligated like defendant, originated devices similar to the licensed ones and manufactured and sold his own instead of his licensor's, seems to me without application.

---

[7] Counsel for cross-appellants have filed a motion to modify this opinion by striking therefrom this and the preceding sentence. The basis of the motion is the apprehension that the language in the two sentences might be construed as meaning that actual fraud was found here. No such construction is justified. The motion is denied.

The Rudd invention is claimed to lie in the elements that close up the opening at the top of the cylinder where the dry ice is fed in, and as I compare the two liquefiers they seem to me to effect the closure on different principles. They both have stoppers to close the cylinder opening, but Rudd's stopper is "held in container closing position by (gas) pressure exerted thereon from the interior of the container." The stopper is tapered so the stronger the gas pressure, the tighter it is wedged into closure. There is a gasket to prevent leakage. When not in use the stopper dangles inside the cylinder by a little chain passed through the opening and fastened on the outside wall. The stopper of the Harrisburg apparatus remains outside the cylinder and is held in container closing position by the mechanical force of a screw clamp, also on the outside of the cylinder, and the gas pressure inside the cylinder has nothing to do with holding the stopper in closing position. Harrisburg's also has a gasket to prevent leakage and the gasket may be affected by the gas pressure, but as I can see neither infringement of nor substantial similarity to Rudd, I would not assess any more royalty in respect to gas for the Harrisburg cylinders. Neither would I restore the royalty money already paid.